# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO.  3:26-cv-96

| | | |
|---|---|---|
| BRADLEY A. GALLAHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| SWITCHBOARD, MD INC., | ) | |
| BLAKE ANDERSON, MD, SARAH | ) | |
| ANDERSON, HANS ANDERSSON, | ) | |
| and WILL AKERS, | ) | |
| | ) | |
| Defendants. | ) | |

**COMES NOW** Bradley A. Gallaher (hereafter "Gallaher" or "Plaintiff"), by and through counsel, and files this Complaint against Switchboard, MD Inc. (hereafter "Switchboard" or "Defendant Switchboard"), Blake Anderson, MD (hereafter "Dr. Anderson" or "Defendant Dr. Anderson"), Sarah Anderson (hereafter "Anderson" or "Defendant Anderson"),  Hans Andersson (hereafter "Andersson" or "Defendant Andersson"), and Will Akers (hereafter "Akers" or "Defendant Akers"), and alleges as follows:

## INTRODUCTION

This case arises from Defendants' unlawful business activities whereby Defendant Blake Anderson, MD exploited his position as the Founder, Chief Executive, and Technology Officer of Switchboard, to enrich himself by defrauding Bradley Gallaher and others, failed to pay Bradley Gallaher salary and commissions earned, accrued, and owed, and engaged in self-dealing, surreptitious business practices to the detriment of Gallaher and others who invested in Switchboard.  Dr. Anderson was aided in his tortious acts by Hans Andersson, Switchboard's VP for Tech Ops and Legal, by Sarah Anderson, Switchboard's Executive Director of Solution Design

1

and Dr. Anderson's wife, and by Will Akers, Switchboard's Chief Strategy Officer. Indeed, Dr. Anderson and Switchboard enticed Gallaher to join Switchboard with the promise of being a well-compensated stakeholder in a business that promised to streamline communication in healthcare organizations for the betterment of patient care. Switchboard, through Dr. Anderson, promised Gallaher a rewarding position, with a financial upside based heavily on commissions and equity, in an attractive start-up in exchange for Gallaher's sweat equity, know-how, and money. However, Switchboard, through Dr. Anderson, Anderson, Andersson, and Akers, tossed Gallaher aside after he invested years of effort making Switchboard a success, and more than $750,000 of his own money into growing the business, so that they could enrich themselves at Gallaher's expense, failing to even pay Gallaher the salary, wages, and commissions he earned by leveraging his connections and know-how to sell Switchboard's platform. To this very day, Switchboard, Dr. Anderson, Anderson, Andersson, and Akers continue to withhold Gallaher's earned, accrued wages and have failed to deliver a return on Gallaher's investment all while enriching themselves and pursuing their own desires.

Through his employment, first as Switchboard's Chief Strategy Officer and subsequently as Switchboard's President, Gallaher played a pivotal role in positioning Switchboard for success and in turn benefiting Switchboard, Dr. Anderson, Anderson, Andersson, and Akers. Gallaher joined Switchboard at its inception, spent years of his life serving as a trusted member and advisor of Switchboard's executive steering committee, generated revenue for Switchboard by owning the entire prospect sales funnel, was involved in every Switchboard sales pursuit, leveraged his consultative selling approach to bring commercially valuable relationships to Switchboard, researched and understood Switchboard's environment and strategic initiatives to align solutions, advised on product development with market feedback to help shape Switchboard's future

roadmap, attended industry events and networked with potential customers who Gallaher converted to actual customers, and applied years of experience and goodwill advising health care executives on new ways to use revenue cycle to strengthen their operations and scale their capabilities to be successful in the future of health care, all for the betterment of Switchboard and its employees, officers, and shareholders. Defendants, however, illegally took advantage of Gallaher's investments, pushed him out for the purpose of unfairly and illegally enriching themselves, and, through decisions made by Dr. Anderson, Anderson, Andersson, and Akers, failed to compensate him for the wages, salary, and commissions he earned. Defendants used Gallaher and his connections and money as part of a common scheme to pursue their own interests hidden behind a veil of deceit and misrepresentation.

These wrongful and unlawful actions by Defendants constitute violations of the North Carolina Wage and Hour Act (N.C. Gen. Stat. § 95-25.1 *et seq.*), common law breach of contract, fraud, and violations of North Carolina's Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1). In addition, Defendants engaged in wrongful and unlawful actions, including but not limited to those violating N.C. Gen. Stat. § 95-25.1 *et seq.*, N.C. Gen. Stat. § 75-1.1, and North Carolina common law in a manner that constitutes a common law civil conspiracy.

## PARTIES

1.     Plaintiff Bradley A. Gallaher is a citizen and resident of Mecklenburg County, North Carolina.

2.     Defendant Switchboard, MD Inc., is a corporation organized and existing by virtue of the provisions of the General Corporation Law of the State of Delaware.

3

3.     Switchboard has a registered office at 1209 Orange Street, Wilmington, County of New Castle, Delaware, 19801. The name of Switchboard's registered agent at the same address is National Registered Agents, Inc.

4.     Switchboard also maintains an active business address at 1700 Northside Drive, Suite A7 OMB 1889, Atlanta, Georgia 30318.

5.     Defendant Blake Anderson is Switchboard's Chief Executive Officer and a citizen and resident of Fulton County, Atlanta, Georgia, residing at 2113 Howell Mill Road NW, Atlanta, Georgia 30318.

6.     Defendant Sarah Anderson is Switchboard's Executive Director, Solution Design, and formerly its Chief Marketing Officer and a citizen and resident of Fulton County, Atlanta, Georgia, residing at 2113 Howell Mill Road NW, Atlanta, Georgia 30318.

7.     Defendant Hans Andersson is Switchboard's Vice President of Tech Ops and Legal, and a citizen and resident of King County, Seattle, Washington, residing at 336 29th Avenue, Seattle, Washington 98122.

8.     Defendant Will Akers is Switchboard's current Chief Strategy Officer and a citizen and resident of Fulton County, Atlanta, Georgia, residing at 138 Brighton Road NE, Atlanta, Georgia 30309.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States, including a corporation of a different State.

10.     This Court has personal jurisdiction over Defendant Switchboard because Switchboard conducts business, and has conducted business, in the State of North Carolina and

4

within this district, employed Plaintiff in this district, negotiated and entered a contract with Plaintiff in the State of North Carolina and in this judicial district, and pursued other contracts with North Carolina corporations. Plaintiff, as well as Defendants Dr. Anderson, Anderson, Andersson, and Akers, have also conducted business on behalf of Switchboard in the State of North Carolina and within this district.

11. This Court has personal jurisdiction over Defendant Dr. Anderson, because Dr. Anderson conducts business and has conducted business in the State of North Carolina and within this judicial district and has marketed Switchboard's products and/or services to companies located in the State of North Carolina and within this judicial district. Dr. Anderson has raised capital from North Carolina investors for Switchboard and his own use in the State of North Carolina and within this judicial district. Dr. Anderson also acted, directly or indirectly, in the interest of Switchboard in relation to Gallaher's employment with Switchboard in the State of North Carolina and within this judicial district.

12. This Court has personal jurisdiction over Defendant Anderson because Anderson conducts business and has conducted business in the State of North Carolina and within this judicial district on behalf of Switchboard. Anderson also acted, directly or indirectly, in the interest of Switchboard in relation to Gallaher's employment with Switchboard in the State of North Carolina and within this judicial district.

13. This Court has personal jurisdiction over Defendant Hans Andersson because Andersson conducts business and has conducted business within the State of North Carolina and within this judicial district and has engaged in efforts to further Switchboard's business interests within the State of North Carolina and within this judicial district. Andersson also acted, directly

or indirectly, in the interest of Switchboard in relation to Gallaher's employment with Switchboard in the State of North Carolina and within this judicial district.

14.     This Court has personal jurisdiction over Defendant Akers because Akers conducts business and has conducted business in the State of North Carolina and within this judicial district on behalf of Switchboard.  Akers also acted, directly or indirectly, in the interest of Switchboard in relation to Gallaher's employment with Switchboard in the State of North Carolina and within this judicial district.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), 28 U.S.C. § 1391(c)(2), and 28 U.S.C. § 1391(d).

16.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1367(b), N.C. Gen. Stat. § 1-75.4, and N.C. Gen. Stat. § 95-25.22(b).

## FACTS

### Plaintiff Bradley Gallaher's Background and Experience in Healthcare

17.     Gallaher grew up in Fayetteville, North Carolina, with two health care practitioner parents.

18.     Gallaher attended the University of North Carolina at Chapel Hill and majored in Business Administration.

19.     Gallaher immersed himself in his studies at Chapel Hill during the academic year, but during the summers he seized opportunities to challenge himself while also contributing to the well-being of others.

20.     In 2004, after graduating from Chapel Hill, Gallaher began working as a Revenue Cycle professional with a leading health-care consulting firm, during which time he learned about the entire revenue cycle of health-care, including initial patient contact, insurance verification,

6

scheduling, billing, payments, denials of healthcare bills and invoices, collection, and the relationships between patients, doctors or hospital providers, insurers, and government payors, including Medicare and Medicaid.

21.    Gallaher's career has been uniquely focused on developing solutions to help healthcare practices function more efficiently throughout the revenue cycle so that more time may be dedicated to the central healthcare mission of treating the patient.

22.    For example, while working in his first healthcare consulting role, Gallaher designed and implemented the company's first specialized billing solution for durable medical equipment insulin pumps for diabetes patients, reducing operational effort by over half and improving revenue collections.

23.    In a variety of healthcare roles, over a twenty-year career, from individual contributor to portfolio owner, Gallaher has designed and implemented innovative solutions that deliver tangible results for his clients and employers.  In his career, he has served healthcare systems, outpatient and specialty clinics, physician practices, ambulance and transportation services, and research organizations.

24.    Gallaher worked in his first healthcare consulting role from 2004 until 2011.

25.    In 2011, Gallaher was hired by a national consulting firm as an Experienced Hire Manager, largely because of his experience in healthcare revenue cycle.

26.    In 2013, while continuing to advance his career as a consultant, Gallaher began an MBA program at Northwestern University's Kellogg School of Management.

27.    Gallaher traveled to Chicago, Illinois, every weekend for two years, while also working full time, to successfully complete the MBA program at the Kellogg School of Management and earn his MBA.

28.     During the same time period, Gallaher's career in the healthcare industry advanced as he was promoted to Senior Manager, the level prior to Principal, at the national consulting firm in the Service Operations service line, focusing on the relationships between people, processes, and technology for consumer healthcare companies, health systems, and health plans, oftentimes for clients experiencing merger & acquisition or performance improvement activities.

29.     During this time, Gallaher led successful projects for large clients including the merger of two four-billion dollar health care organizations to form an entity operating 43 hospitals in seven states.

30.     In addition, one of his primary projects was leading innovations in technology for a publicly traded healthcare revenue cycle services company to improve process automation and advanced analytics, resulting in reducing onshore and offshore revenue cycle staff.

31.     In 2020, Gallaher was hired by Olive AI, Inc. ("Olive"), an IT services and IT consulting company that delivered automation and intelligence to automate processes in healthcare.

32.     Gallaher's first position  at Olive was Executive Director for Healthcare Artificial Intelligence Transformation.

33.     In the Executive Director role, Gallaher was responsible for leading a portfolio of sales utilizing a team of five sales associates and several marketing team members.  He sold automation programs focused on returning lost revenue and reducing the cost of operations, including a Covid-19 scheduling bot that eliminated staff and significantly reduced vaccination wait times.

34.     In early 2022, within two years of joining Olive, Gallaher received a promotion to the position of Senior Vice President over the company's Healthcare Provider Market, and in that

role he was responsible for four Executive Directors and their teams of sales associates and marketers as well as a larger revenue portfolio.

35. At Olive, Gallaher worked with Ankit Tiwari ("Tiwari"), who would later join Gallaher at Switchboard.

## **INTRODUCTION TO DR. ANDERSON**

36. It was through his professional endeavors at Olive, and with Tiwari, that Gallaher was introduced to Dr. Anderson through a contact at Emory University working on a strategic partnership with Olive.

37. Dr. Anderson graduated from the University of Georgia in 2007 with a BS in Chemistry, and he obtained his MD from the Emory University School of Medicine in 2011.

38. After obtaining his MD, Dr. Anderson gained substantial experience in different healthcare environments, first working as a General Surgery Intern in Florida and then as a resident at the Emory University School of Medicine.

39. After completing his residency, Dr. Anderson continued working as a provider at the Emory University School of Medicine.

40. Dr. Anderson was employed full-time at Emory University Hospital and the VA Hospital in Atlanta when he met Gallaher.

41. At the time they were introduced, Dr. Anderson was developing a product that would route messages to physicians and their staff via a portal, creating efficiency for physicians, clinics, and hospital systems, and he was looking for ways to bring the product to market.

42. During this timeframe Dr. Anderson was promoting the message-routing product, and he began to pursue Tiwari to start Switchboard, MD in part to bring the message-routing product to market.

9

43.     Tiwari was more interested in supporting Dr. Anderson in an advisory capacity while pursuing other offers or starting his own business, but Dr. Anderson was persistent about having Tiwari join him to launch Switchboard.

44.     As Tiwari considered Dr. Anderson's offer, Tiwari informed Dr. Anderson that he was more likely to join Switchboard if he could bring Gallaher.

45.     To secure Tiwari, Dr. Anderson represented that Tiwari and Gallaher would be co-founders of Switchboard.

46.     Relying on Dr. Anderson's representations, Tiwari explained the opportunity to Gallaher, to help co-found Switchboard and bring the message-routing product to market, along with the opportunity to develop other new and innovative technology and products based on Gallaher's unique experience and knowledge of healthcare.

47.     Gallaher strongly believed in Switchboard's initial product,  the artificial intelligence solution that automatically routed messages to appropriate endpoints based on the clinical or administrative relevance of what a patient might send to a provider.

48.     Dr. Anderson contacted Gallaher while he was on paternity leave from Olive to recruit him to join Switchboard and offered him the position of Chief Strategy Officer.

49.     To entice Gallaher away from Gallaher's position at Olive and secure Gallaher's commitment to join Switchboard as its Chief Strategy Officer, Dr. Anderson promised Gallaher a base salary of $120,000, lucrative incentives on a sliding scale of deal commission on all revenue earned by Switchboard (5% on sales up to 1,000,000, 6% on sales up to $3,000,000, 8% on sales over $3,000,000, additional 3% for any deals secured independently), and equity in Switchboard of 3% at offer acceptance, vested immediately, growing by an additional 3.5% per year (12 months) until 10% total equity was reached.

10

50. Based on Dr. Anderson's representations about his salary, lucrative incentive-based-compensation, the ownership structure, and participation in control, Gallaher agreed to join Switchboard as its Chief Strategy Officer and to launch the company with Dr. Anderson and Tiwari.

## THE ENGAGEMENT LETTER – AUGUST 26, 2022

51. Dr. Anderson presented Gallaher with an engagement letter memorializing the promises he made to secure Gallaher's employment with Switchboard.

52. The engagement letter stated that Gallaher would be Switchboard's Chief Strategy Officer.

53. The Engagement Letter provided Gallaher with one (1) board vote in Switchboard.

54. The Engagement Letter provided Gallaher with a base salary of $120,000.00.

55. The Engagement Letter provided Gallaher with incentives, including a sliding scale of deal commission on all revenue earned by Switchboard of 5% on sales up to $1,000,000, 6% on sales up to $3,000,000, 8% on sales over $3,000,000, and an additional 3% for any deals secured independently.

56. The Engagement Letter also provided Gallaher with equity in Switchboard, with 3% at offer acceptance, vested immediately, an additional 3.5% per year (12 months) until 10% of equity in Switchboard was reached, with an additional 0.5% equity at major milestones of revenue.

57. As Chief Strategy Officer, Gallaher would serve as a trusted member and advisor on Switchboard's executive steering committee and would be an officer in the original articles of incorporation, generate revenue for Switchboard by owning the entire prospect sales funnel from identification to design and closure of deals with involvement in every Switchboard sales pursuit, prospect for new Health System Customers, leverage consultative selling approaches and bring

11

existing market relationships to Switchboard, research and understand each prospect environment and strategic initiatives to best align solutions, advise product development with market feedback and help shape the future roadmap, attend industry events and network with potential customers, and explore ways to develop intellectual property.

58.     Dr. Anderson also promised that Gallaher would have full authority to hire and build the go-to-market team.

59.     Dr. Anderson and Gallaher signed the engagement letter on August 26, 2022.

## SWITCHBOARD, MD

60.     Switchboard was formed in the fall of 2022 by Dr. Anderson, the company's Chief Executive Officer.

61.     Dr. Anderson recruited Gallaher to join Switchboard.

62.     Gallaher expressed to Dr. Anderson that it was very important that he be a part of the board governance of Switchboard, and he requested a board seat.

63.     Dr. Anderson promised Gallaher that he would have a board seat and Dr. Anderson even prepared a memorandum of understanding that described the structure of the board and the role Dr. Anderson claimed Gallaher would have.

64.     Gallaher also expressed concerns about how Switchboard would be funded.

65.     To assuage Gallaher's questions about Switchboard's funding, Dr. Anderson told Gallaher that funding for Switchboard would be available through Dr. Anderson's network of family and friends.

66.     Dr. Anderson represented that his family was in a strong financial position and could support a start-up enterprise like Switchboard.

12

67. Dr. Anderson stressed that he would do anything to make sure Switchboard was successful, including joining Switchboard full-time.

68. Based on the promises made by Dr. Anderson, Gallaher accepted the offer of employment as Chief Strategy Officer at Switchboard.

69. When he agreed to join Switchboard as the Chief Strategy Officer, Gallaher fully expected that Dr. Anderson and Switchboard would keep the promises made to Gallaher, including all of the promises set forth in the August 26, 2022 Engagement Letter that described the terms of Gallaher's compensation, including base pay and commissions, and Gallaher's equity opportunity.

70. For example, upon Switchboard's initial corporate formation, Gallaher questioned the Class A share approach to company governance, but Dr. Anderson assured Gallaher that Switchboard would soon establish a more traditional fiduciary board with Gallaher having a seat on the Board.

71. Dr. Anderson made pre-formation representations that there were already discussions and negotiations regarding lucrative opportunities with prominent universities and that there were strong leads on prospective customers.

72. After its founding, Switchboard, with the work, experience, and contacts provided by Brad Gallaher and Ankit Tiwari, branded and marketed Dr. Anderson's routing product as "MDAware."

73. The MDAware artificial intelligence solution classifies and tags information so that the information is prioritized based on context and then routed to the right team member within the healthcare provider's organization along with suggesting the next actions that can be taken with the information received.

13

74.     Gallaher and Tiwari closed all the deals for Switchboard after its formation.

75.     Meanwhile, Dr. Anderson continued to work independently of Switchboard as the Chief Health Informatics Officer at the Atlanta VA and as a primary care physician at Emory, and later in 2023, the VA national office of integrated veteran care, deriving an income from both sources independent of Switchboard, even though he had represented to Gallaher that he would join Switchboard full-time after its formation.

76.     In 2023, there was only one paying contract for MDAware, so Gallaher and his team, using Gallaher's extensive experience as a revenue cycle professional, built a revenue cycle tool specifically for a healthcare provider in Wisconsin, which was a software as a service subscription that would use artificial intelligence and algorithms to reduce accounts receivable for clinics and hospital systems.

77.     The product for the Wisconsin healthcare provider that Gallaher created and developed with Tiwari's assistance, resulted in at least $4,000,000.00 revenue for Switchboard.

78.     Through Switchboard, Gallaher and Tiwari branded and marketed the product as "RevAware."

79.     To date, RevAware has been the most successful product of Switchboard in revenue generated for the company.

<u>**INDIVIDUAL DEFENDANTS ANDERSON AND AKERS**</u>

80.     Defendant Anderson is Dr. Anderson's wife.

81.     Anderson is described in Switchboard's corporate documents as originally holding the title of Chief Marketing Officer of Switchboard and currently holds the position of Executive Director, Solution Design.

14

82.     However, Anderson has not actively performed the type of work expected of a Chief Marketing Officer or Executive Director of Solution Design.

83.     Yet, because she is Dr. Anderson's wife, Anderson has had a seat on the Executive Leadership Team.

84.     Additionally, Anderson has been a Class A shareholder since the founding of Switchboard.

85.     Upon information and belief, Anderson has no experience in healthcare consulting and has no experience in the development of artificial intelligence and technology solutions for healthcare or the revenue cycle of physicians, healthcare providers, or healthcare companies.

86.     Upon information and belief, Anderson has exerted significant authority over Switchboard including influencing decisions to terminate Gallaher and withhold the wages promised to Gallaher as commissions because such decisions inure to her financial benefit.

87.     Anderson also exerted significant authority over Switchboard by influencing use of company funds to improve the Andersons' personal residence under the guise of using part of the residence as Switchboard's corporate office.

88.     Defendant Akers was Dr. Anderson's college roommate.

89.     Akers has been a Class A Shareholder of Switchboard since the company's founding even though he was employed elsewhere and had no official role at Switchboard.

90.     Upon information and belief, Akers exerted significant authority over Switchboard including influencing the selection of his brother as Switchboard's first outside counsel.

91.     Upon information and belief, Akers has no experience in healthcare consulting and has no experience in the development of artificial intelligence and technology solutions for healthcare or the revenue cycle of physicians, healthcare providers, or healthcare companies.

92.     Upon information and belief, Akers did not have the experience to close deals for Switchboard, so Gallaher and Tiwari closed all the deals for Switchboard.

93.     Upon information and belief, Akers has exerted significant authority over Switchboard including influencing decisions to terminate Gallaher and withhold the wages promised to Gallaher as commissions because such decisions inure to Akers' financial benefit.

## SALARY AND COMMISSIONS EARNED BY, BUT UNPAID TO, GALLAHER

94.     Gallaher's efforts were integral to Switchboard securing sales and retaining talent.

95.     Based on the commission structure Dr. Anderson promised, and Gallaher and Dr. Anderson agreed upon in the signed Engagement Letter, Gallaher accrued the right to payment of approximately $430,000 of commission wages.

96.     Some of the commissions owed to Gallaher are reflected on Switchboard's balance sheet and tax returns.

97.     Upon information and belief, some of the commissions Switchboard owed Gallaher are not reflected on Switchboard's balance sheet and tax returns, but Gallaher is entitled to payment of those commissions because Switchboard received the performance-based payments and revenue from sales, resulting in  commissions owed to Gallaher based on the parties' Engagement Letter.

98.     In July of 2024, Gallaher accepted a revised compensation structure from Dr. Anderson and Switchboard, entailing a higher base salary with a non-commissioned bonus structure that Gallaher earned with the right to payment accruing to him in June of 2025.

99.     As of early 2025, Switchboard and Dr. Anderson had failed to pay Gallaher the complete wages owed to him, including commissions and unpaid, but promised, salary.

100.     Gallaher began to question Dr. Anderson why the promised fiduciary Board had not been created.

16

## MARCH 2025 MEMORANDUM OF UNDERSTANDING

101. On March 31, 2025, Switchboard, Dr. Anderson, and Gallaher entered into a "Memorandum of Understanding" that outlined plans for Switchboard's fiduciary board, which would be a five-person fiduciary board composed of one seat allocated to Dr. Anderson, one seat allocated to Gallaher, and three additional members to be determined at the time of an initial institutional fundraising round with a preference for at least one independent board member.

102. In exchange for the Memorandum of Understanding's promise of the fiduciary board, Gallaher provided Switchboard and Dr. Anderson with a cash investment of $125,000.00.

## INDUCEMENTS FOR CAPITAL INVESTMENTS IN SWITCHBOARD, MD

103. Over the time of his employment with Switchboard, Gallaher invested substantial sums into Switchboard, totaling approximately $750,000.00.

104. Dr. Anderson induced Gallaher to make these investments in part by representing there were additional resources available to Switchboard in the form of funds from Dr. Anderson's network of family and friends.

105. Based on the promises made by Dr. Anderson, who continued to represent to Gallaher that he would be a critical guiding force for Switchboard's development and would devote full-time focus to Switchboard, Gallaher continued to invest substantial sums of his own money into Switchboard.

106. On or about March 31, 2025, Dr. Anderson promised Gallaher that a five-person fiduciary board would be established for Switchboard, with one seat going to Dr. Anderson, one seat going to Gallaher, and three additional members determined at the time of institutional fundraising round with a preference for at least one independent board member.

17

107. Dr. Anderson made the promises to Gallaher regarding the fiduciary board to induce Gallaher to invest additional money into Switchboard.

108. Based on the promises and representations Dr. Anderson made to him about the fiduciary board, Gallaher invested $125,000 into Switchboard, amounting to the largest single investment Gallaher made to-date.

109. Behind the scenes, Dr. Anderson was acting in his self-interest and to enrich himself, his wife, his cousin, and his college roommate at the expense of Gallaher and others who invested in Switchboard based on promises made to them by Dr. Anderson.

### DEFENDANT HANS ANDERSSON JOINS SWITCHBOARD, MD

110. In April or May of 2025, Dr. Anderson began to introduce the idea of having his cousin, Hans Andersson, join the company.

111. Andersson attended Yale University, where he obtained an AB in Ethics, Politics, and Economics.

112. Andersson later attended Harvard's Extension School where he earned an ALM in Software Engineering, and Stanford University, where Andersson obtained his JD at the Stanford School of Law and his MSc in Management Science and Engineering from the Stanford University School of Engineering.

113. After completing his education, Andersson worked as an associate at a prestigious law firm and as corporate counsel and senior corporate counsel at one of the largest publicly-traded corporations in the world.

114. Dr. Anderson often spoke about Andersson and discussed the potential value of bringing Andersson on as Switchboard's in-house counsel.

18

115.    Dr. Anderson ultimately hired Andersson as Switchboard's VP of Technology Operations and Legal in the Summer of 2025, first indicating that Andersson join "half-time" at the VP level.

116.    As Switchboard's VP of Technology Operations and Legal, Andersson supported and encouraged Dr. Anderson's decisions, such as the decision to withhold payment of commissions and other wages owed to Gallaher.

117.    Dr. Anderson and Andersson were and continue to be decisionmakers who controlled the terms and conditions of Gallaher's employment at Switchboard and acted in the interest of Switchboard in relation to Gallaher as to decisions on payment or non-payment of Gallaher's salary, wages, and commissions.

118.    Upon information and belief, Anderson and Akers also participated in important decisions impacting the terms and conditions of Gallaher's employment at Switchboard and acted in the interest of Switchboard in relation to Gallaher as to decisions on payment or non-payment of Gallaher's salary, wages, and commissions.

119.    Upon information and belief, Dr. Anderson brought Andersson, an accomplished corporate attorney, into Switchboard to push Gallaher out and to justify withholding salary, wages, and commissions owed to Gallaher.

120.    Upon information and belief, Anderson and Akers also encouraged Dr. Anderson and Andersson to push Gallaher out and to withhold salary, wages, and commissions owed to Gallaher.

121.    Dr. Anderson and Andersson, along with Anderson and Akers, exerted absolute control over Gallaher when it came to making and carrying out decisions regarding the terms and conditions of Gallaher's employment at Switchboard.

## TERMINATION OF GALLAHER – OCTOBER 2025

122. On October 10, 2025, after three years of Gallaher's hard work on behalf of and personal financial investment in Switchboard, Dr. Anderson emailed Gallaher to communicate that he had made the decision to end Gallaher's employment with Switchboard and that Gallaher's employment would conclude on October 31, 2025.

123. Upon information and belief, Dr. Anderson consulted with Andersson regarding ending Gallaher's employment at Switchboard.

124. Upon information and belief, Dr. Anderson consulted with Akers regarding ending Gallaher's employment at Switchboard.

125. Upon information and belief, Dr. Anderson consulted with Anderson about ending Gallaher's employment at Switchboard.

126. On October 10, 2025, via email, Dr. Anderson placed Gallaher on what Dr. Anderson called "garden leave," unilaterally relieved Gallaher of all his duties, and informed Gallaher that his final paychecks and eligibility for Switchboard's benefit plans would continue through October 31, 2025.

127. On October 10, 2025, in the same email, Dr. Anderson asked Gallaher to submit a voluntary resignation rather than be terminated.

128. Following Dr. Anderson's communications to Gallaher, Andersson emailed Gallaher to inform him of several "housekeeping" points regarding the end of Gallaher's employment.

129. In the October 10, 2025 email, Andersson explained to Gallaher that being on "garden leave" meant that Switchboard expected Gallaher not to provide services, that Gallaher was no longer an officer or "active service provider" of Switchboard, and that Gallaher should not

represent himself as an officer or active service provider of Switchboard any longer, including to Switchboard's employees, investors, affiliates or to other third parties.

130.     Andersson further instructed Gallaher that, although his employment, pay, and benefits were ending effective October 31, 2025, at which point Switchboard would have no further obligations to Gallaher, Switchboard expected Gallaher to adhere to the terms of a "Confidentiality and Proprietary Information and Inventions Agreement" which contained an overly broad and unreasonable "Non-Compete and Non-Solicitation" clause that sought to restrict Gallaher's right to work for a period of twelve months, including "performing *any* services for a Competing Business" and unreasonably endeavoring to control Gallaher to the point of requiring that he would "disclose, in writing, any outside business activity to the Company's Chief Executive Officer [Dr. Anderson] and secure permission from the Company's Chief Executive Officer [Dr. Anderson] before engaging in such activity so that the Company may evaluate whether such activity conflicts with the best interests of the Company…"

131.     Dr. Anderson and Andersson terminated Gallaher, failed to pay Gallaher the salary, wages, and commissions legally owed to him, yet informed him that he must adhere to overbroad and likely legally unenforceable promises and covenants that would restrict his right to make a living and provide for his family, would preclude him from using the skills and experience obtained throughout his career in healthcare revenue cycle, consulting, and technology prior to joining Switchboard, and would strip him of intellectual property rights associated with the revenue cycle solutions that Gallaher uniquely developed.

132.     Andersson also informed Gallaher that Gallaher's stock options in Switchboard that were unvested when Gallaher's employment ended on October 31 would stop vesting and would be cancelled immediately.

21

133.     On October 17, 2025, Gallaher asked Dr. Anderson and Andersson to have Switchboard pay him all of his accrued wages on or before Switchboard's next regular payday as Gallaher understood was his right under North Carolina's Wage and Hour Act.

134.     In response to Gallaher's request to be paid his accrued wages, Defendants Dr. Anderson and Andersson wrote that they were considering legal action against Gallaher.

135.     To date, Defendants have failed to pay Gallaher his accrued salary, wages, and commissions in a total amount exceeding $430,000.00.

136.     Gallaher also asked Dr. Anderson and Andersson if he could inspect Switchboard's books and records for purposes of valuing his interest in the corporation and to investigate mismanagement or wrongdoing.

137.     In response to Gallaher's request, Andersson claimed that he was overseeing an investigation by Switchboard into Gallaher, threatened to bring claims against Gallaher based on evidence that Switchboard possessed, asserted that Switchboard was "baffled" by Gallaher's request to be paid the commissions promised to him.

## FIRST CLAIM FOR RELIEF

### (North Carolina Wage and Hour Act Violations – Against All Defendants)

138.     Gallaher incorporates by reference in this Claim for Relief Paragraphs 1 through 137 of this Complaint as if fully set forth herein.

139.     Gallaher filed this action to recover his unpaid commissions and all other wages and relief authorized under the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1 et seq.

140.    At all relevant times, Switchboard has been an "employer" within the meaning of the NCWHA, N.C. Gen. Stat. § 95-25.2(5), because Switchboard has been acting directly or indirectly in the interest of the employer in relation to Gallaher.

141.    At all relevant times, Dr. Anderson was and is an "employer" within the meaning of the NCWHA, N.C. Gen. Stat. § 95-25.2(5), because Dr. Anderson has been acting directly or indirectly in the interest of the employer in relation to Gallaher, as the CEO of Switchboard.

142.    At all relevant times, Anderson was and is an "employer" within the meaning of the NCWHA, N.C. Gen. Stat. § 95-25.2(5), because Anderson has been acting directly or indirectly in the interest of the employer in relation to Gallaher, as the Executive Director, Solution Design, as a member of the Executive Leadership Team, and the former Chief Marketing Officer..

143.    At all relevant times, Andersson was and is an "employer" within the meaning of the NCWHA, N.C. Gen. Stat. § 95-25.2(5), because Andersson has been acting directly or indirectly in the interest of the employer in relation to Gallaher, as the Vice President of Tech Ops and Legal.

144.    At all relevant times, Akers was and is an "employer" within the meaning of the NCWHA, N.C. Gen. Stat. § 95-25.2(5), because Akers has been acting directly or indirectly in the interest of the employer in relation to Gallaher, as the Chief Strategy Officer, and holding other titles previously.

145.    At all relevant times, Gallaher was an "employee" as defined by NCWHA, N.C. Gen. Stat. § 95-25.2(4).

146.    The NCWHA, N.C. Gen. Stat. § 95-25.7, states that an employee whose "employment is discontinued for any reason shall be paid all wages due on or before the next regular payday…"  Such wages may not be forfeited unless the employee has been notified in

23

writing or through a posting available to all employees in accordance with the NCWHA, N.C. Gen. Stat. § 95-25.13(3).

147.    The NCWHA, N.C. Gen. Stat. § 95-25.2(16), states that a "wage' includes sick pay, vacation pay, severance pay, commissions, bonuses, and other amounts promised when the employee has a policy or a practice of making such payments."

148.    The wages owed to Gallaher as a result of his termination include commissions, withheld base salary payments, and other amounts promised to Gallaher.

149.    Defendants did not pay Gallaher the wages owed, including the commissions, withheld base salary payments, and other amounts promised, on the first pay period following Gallaher's termination.

150.    Defendants promised Gallaher that his compensation would include a "sliding scale of deal commission on all revenue earned by Switchboard", including "5% on sales up to $1,000,000", "6% on sales up to $3,000,000", "8% on sales over $3,000,000", and "[a]dditional 3% for any deals secured independently."

151.    Based on the promised commission structure, and based on actual revenue earned by Switchboard, approximately $428,680.00 of commissions have accrued to and are owed to Gallaher.

152.    Defendants also failed to pay Gallaher the complete base salary amounts promised to him.

153.    Defendants, however, had a practice of making commission payments and base salary payments to other Switchboard employees.

154.    Failure to pay or provide all wages, compensation, and benefits due to Gallaher by the next regular payday after the end of his employment is a violation of the NCWHA.

24

155.   Under the NCWHA, N.C. Gen. Stat. § 95-25.22(a), "Any employer who violates the provisions of… 95-25.6 through 95-25.12 (wage payment) shall be liable to the employee…. affected in the amount of their… unpaid amounts due under G.S. 95-25.6 through 95-25.12, as the case may be, plus interest at the legal rate set forth in G.S. 24-1, from the date each amount first came due."

156.   The NCWHA, N.C. Gen. Stat. § 95-25.22(a1), provides further: "In addition… the court shall award liquidated damages in an amount equal to the amount found to be due as provided in section (a)" above.

157.   Defendants failed to notify Gallaher that any wages due to him were forfeited in accordance with N.C. Gen. Stat. § 95-25.13 as the result of any policy or practice which results in forfeiture.

158.   Gallaher made a specific demand to Defendants that they pay him all wages due to him under the NCWHA by no later than the next regular payday following the end of his employment.

159.   Defendants refused Gallaher's demand and failed to pay him his wages and commissions due under the NCWHA and claimed that they were "baffled by this suggestion and unclear what the basis for it could be."

160.   As a result, Gallaher is entitled to recover from Defendants, jointly and severally, an amount in excess of four-hundred thousand dollars ($400,000.00) to be proven at trial, for all unpaid wages and related benefits, interest at the highest legal rate from the date due, liquidated damages, attorneys' fees, and costs.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract – Against Switchboard and Dr. Anderson)

161.    Gallaher incorporates by reference in this Claim for Relief Paragraphs 1 through 160 of this Complaint as if fully set forth herein.

162.    Gallaher's August 26, 2022, Switchboard, MD Engagement Letter (the "Engagement Letter") is a binding contract between Gallaher and Switchboard and Dr. Anderson.

163.    In exchange for the promises that Switchboard and Dr. Anderson made to Gallaher in the Engagement Letter, Gallaher agreed to work full-time for Switchboard and Dr. Anderson.

164.    Gallaher, Switchboard, and Dr. Anderson agreed to the terms of the Engagement Letter as evidenced by, among other things, the fact that Dr. Anderson and Gallaher both signed the Engagement Letter on August 26, 2022.

165.    Switchboard and Dr. Anderson breached the Engagement Letter by failing to pay Gallaher the complete base salary promised, failing to pay Gallaher the complete incentives promised, including the deal commission on all revenue earned by Switchboard, and by failing to award Gallaher the complete equity promised.

166.    Switchboard and Dr. Anderson knowingly and purposefully breached the Engagement Letter by failing to pay Gallaher the complete base salary promised, failing to pay Gallaher the complete incentives promised, including the deal commission on all revenue earned by Switchboard, by failing to award Gallaher the complete equity promised, and then by conspiring with Hans Andersson to act as if the promises set forth in the Engagement Letter were never made.

167.    As a direct and proximate result of Switchboard and Dr. Anderson's breach of the Engagement Letter, including their knowing and purposeful breach, Gallaher was damaged financially, professionally, reputationally, and emotionally.

168.     Switchboard and Dr. Anderson's breach of the Engagement Letter was intentional, outrageous and aggravated, done with actual malice, oppression, rudeness, insult, indignity, and a reckless disregard for Gallaher's rights and interests, such that Gallaher is entitled to an award of punitive damages pursuant to N.C. Gen. Stat. § 1D-15, and his costs and attorneys' fees.

169.     In addition to breaching the terms of the Engagement Letter, Dr. Anderson and Switchboard breached the Memorandum of Understanding, including in a knowing and purposeful manner, by failing to follow through with the creation of the fiduciary board.

170.     As a direct and proximate result of Switchboard and Dr. Anderson's breach of the Memorandum of Understanding, including their knowing and purposeful breach, Gallaher was damaged financially, professionally, reputationally, and emotionally.

171.     Switchboard and Dr. Anderson's breach of the Memorandum of Understanding was intentional, outrageous and aggravated, done with actual malice, oppression, rudeness, insult, indignity, and a reckless disregard for Gallaher's rights and interests, such that Gallaher is entitled to an award of punitive damages pursuant to N.C. Gen. Stat. § 1D-15, and his costs and attorneys' fees.

172.     As a result, Gallaher is entitled to recover from Switchboard and Dr. Anderson, jointly and severally, an amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial, including compensatory, consequential, general, special, and punitive damages, the costs of this action plus prejudgment interest at the highest legal rate.

### THIRD CLAIM FOR RELIEF

**(Unjust Enrichment –
Against All Defendants)**

173.     Plaintiff incorporates by reference Paragraphs 1 through 172 of this Complaint as if fully set forth herein.

174. Gallaher conferred benefits on Switchboard, Dr. Anderson, Anderson, Andersson, and Akers by, among other things, devoting his time and energy to growing Switchboard, to the exclusion of other employment, by working to promote Switchboard's business relationships, and by improving Switchboard's artificial intelligence products.

175. In addition, Gallaher conferred benefits on Switchboard, Dr. Anderson, Anderson, Andersson, and Akers in the form of multiple capital investments totaling approximately $750,000.00.

176. Dr. Anderson individually and as the founder of Switchboard consciously accepted the benefits conferred by Gallaher on Dr. Anderson personally and on Switchboard.

177. Anderson individually and as a member of the Executive Leadership Team of Switchboard consciously accepted the benefits conferred by Gallaher on her personally and on Switchboard.

178. Andersson individually and as VP of Technology Operations and Legal of Switchboard consciously accepted the benefits conferred by Gallaher on him personally and on Switchboard.

179. Akers individually and as Chief Strategy Officer of Switchboard consciously accepted the benefits conferred by Gallaher on him personally and on Switchboard.

180. Dr. Anderson, Anderson, Andersson, and Akers failed to perform work on behalf of and failed to make capital investments in Switchboard to justify retaining the profits earned by Switchboard and equity in the company to the detriment of Gallaher.

181. Gallaher did not confer the benefits of his time, work, and capital investments on Switchboard, Dr. Anderson, and the other individual Defendants gratuitously.

182.    Gallaher expected to be paid his commissions and salary in full, to receive stock options and shares in Switchboard as promised, to receive a Board position as promised, to receive a percentage of the profits generated by the RevAware product, and to receive the other remuneration promised by Dr. Anderson.

183.    Gallaher acted at Dr. Anderson's request and did not interfere in the affairs of Switchboard.

184.    Switchboard, Dr. Anderson, Anderson, Andersson, and Akers were unjustly enriched at Gallaher's expense and to his detriment.

185.    Gallaher is entitled to recover the value of the benefit conferred on Switchboard, Dr. Anderson, Anderson, Andersson, and Akers in quantum meruit, for the reasonable value of the services rendered and work performed for Switchboard, which benefitted Switchboard and each of the individual Defendants who remain employed by Switchboard and, upon information and belief, receive salary, commissions, bonuses, and stock and stock options, among other benefits of employment by and interest in Switchboard.

186.    Gallaher is entitled to recover the amount of the capital investments he made for the benefit of Switchboard and the value of benefits unjustly conferred on Switchboard and each of the individual Defendants Dr. Anderson, Anderson, Andersson, and Akers.

## FOURTH CLAIM FOR RELIEF

### (Fraud – Against Switchboard and Dr. Anderson)

187.    Plaintiff incorporates by reference Paragraphs 1 through 186 of this Complaint as if fully set forth herein.

188.    Switchboard and Dr. Anderson made promises prior to the signed Engagement Letter to induce Gallaher to leave his employment to become an employee of Switchboard.

29

189.   Switchboard and Dr. Anderson made the promises set forth in the Engagement Letter to induce Gallaher to leave his employment to become an employee of Switchboard.

190.   Switchboard and Dr. Anderson made the promises set forth in the Memorandum of Understanding to induce Gallaher to invest more than one-hundred thousand dollars ($100,000.00) into Switchboard for the benefit of Switchboard and Dr. Anderson personally.

191.   At no point in time prior to his termination did Switchboard or Dr. Anderson disclose to Gallaher that he would not be paid the wages promised in the Engagement Letter.

192.   At no point in time prior to his termination did Switchboard or Dr. Anderson disclose to Gallaher that he would not be given the fiduciary board seat promised in the Memorandum of Understanding.

193.   The promises and representations that Switchboard and Dr. Anderson made to Gallaher in the Engagement Letter and in the Memorandum of Understanding constitute false representations or concealments of material fact that were reasonably calculated to deceive, were made with the intent to deceive or with reckless disregard of the likelihood of deception, did in fact deceive Gallaher, and damaged Gallaher as a result.

194.   Switchboard and Dr. Anderson also promised and represented that Gallaher would receive a percentage of revenue generated from commercialization of the RevAware product and profit generated from the product.

195.   The misrepresentations and concealments described above were material to Gallaher.

196.   Gallaher reasonably relied on the misrepresentations and concealments such that he gave up a lucrative job to join Switchboard.

197.     Gallaher reasonably relied on the misrepresentations and concealments such that he agreed to make repeated cash infusions and capital investments into Switchboard.

198.     Gallaher reasonably relied on the promises made by Switchboard and Dr. Anderson in the Engagement Letter and in the Memorandum of Understanding.

199.     Had Gallaher known that Switchboard and Dr. Anderson did not consider the promises and representations made in the Engagement Letter and Memorandum of Understanding to be enforceable and binding, Gallaher would not have left his job at Olive to join Switchboard or made cash infusions and investments in the Switchboard.

200.     As a direct and proximate result of Switchboard and Dr. Anderson's knowing and purposeful deception of Gallaher, Gallaher has been damaged financially, professionally, reputationally, and emotionally.

201.     Switchboard and Dr. Anderson's fraudulent misrepresentations and concealments described above were intentional, outrageous and aggravated, done with actual malice, oppression, rudeness, insult, indignity, and a reckless disregard for Gallaher's rights and interests, such that Gallaher is entitled to an award of punitive damages pursuant to N.C. Gen. Stat. § 1D-15, as well as treble damages pursuant to N.C. Gen. Stat. § 75-16, and his costs and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

202.     As a result, Gallaher is entitled to recover from Switchboard and Dr. Anderson, jointly and severally, an amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial, including compensatory, consequential, general, special, and punitive damages, the costs of this action plus prejudgment interest at the highest legal rate.

## FIFTH CLAIM FOR RELIEF

### (Negligent Misrepresentation in the Alternative to Fraud – Against Switchboard and Dr. Anderson)

203.    Plaintiff incorporates by reference Paragraphs 1 through 202 of this Complaint as if fully set forth herein.

204.    Switchboard and Dr. Anderson had a pecuniary interest in the matter of Gallaher's employment with Switchboard.

205.    Switchboard and Dr. Anderson had a pecuniary interest in, among other things, Gallaher's work developing concepts for Switchboard's products, Gallaher's work developing Switchboard's actual products, and Gallaher's involvement planning ways to market the products, build customer relationships, and close deals.

206.    Switchboard and Dr. Anderson had a pecuniary interest in the matter of Gallaher's involvement with Switchboard in the form of making capital investments.

207.    Dr. Anderson and Switchboard supplied false information to Gallaher for his guidance in his business transactions and employment relationship with Dr. Anderson and Switchboard, for example: by stating that Gallaher's salary and commissions would be paid in full according to the terms of the Engagement Letter and misrepresenting Gallaher's involvement in corporate governance and the Board and by promising Gallaher a percentage or share in the revenue generated from the RevAware product.

208.    Dr. Anderson, individually and on behalf of Switchboard, supplied the false information to cause Gallaher to join Switchboard and to continue working for Switchboard, and to guide Gallaher in the conduct of his business transactions and employment relationship with Switchboard.

209.    Dr. Anderson individually and on behalf of Switchboard obtained a pecuniary gain through supplying information to Gallaher in the course of his business and employment relationship with Switchboard.

210.    The pecuniary gain obtained by Dr. Anderson and Switchboard includes retaining for their own benefit the salary and commissions owed to Gallaher, receiving direct and indirect financial benefits from the capital investments made by Gallaher, and obtaining control over Switchboard, all to Gallaher's detriment.

211.    Gallaher reasonably relied on the information provided by Dr. Anderson and Switchboard in the form of promises in the signed Engagement Letter as to salary and commissions to be paid, and in the Memorandum of Understanding.

212.    Switchboard continued to be a successful company, and Gallaher reasonably relied on promises to be compensated in the form of his salary, commissions, a board seat and leadership in Switchboard, and other benefits.

213.    Gallaher requested information and made reasonable inquiry into the representations, but he could not learn the true facts because Dr. Anderson, Switchboard, and Andersson have exclusive access and control over the information.

214.    Gallaher has been damaged because of Dr. Anderson and Switchboard's negligent misrepresentations, and Gallaher is entitled to recover damages for the negligent misrepresentations.

## SIXTH CLAIM FOR RELIEF

### (Unfair and Deceptive Practices – Switchboard and Dr. Anderson)

215.    Plaintiff incorporates by reference in this Claim for Relief the allegations contained in Paragraphs 1 through 214 of this Complaint as if fully set forth herein.

33

216.    The hiring and recruitment practices and processes of Switchboard and Dr. Anderson are in and affecting commerce.

217.    Switchboard and Dr. Anderson hire employees and utilize the team they employ to accomplish their ultimate goal – successful sales of Switchboard's products and services, including in North Carolina.

218.    The actions of Switchboard and Dr. Anderson were not restricted to a single market participant but were actions "in and affecting commerce" because prospective employees and employers exist as market participants.  Prospective employers are involved in the selling of services in part to attract prospective employees by making promises of benefits and compensation, and prospective employees are involved supporting the employers' services in commerce by offering their acceptance of employment and fulfilling the obligations of their employment.

219.    The business of Switchboard is in and affecting commerce because it sells its artificial intelligence product to healthcare providers.

220.    "'[C]ommerce' includes all business activities, however denominated[.]"  N.C. Gen. Stat. § 75-1.1(b).

221.    Switchboard and Dr. Anderson engaged in unfair and deceptive practices in hiring Gallaher and utilizing him to recruit other employees and make sales of products and services.

222.    As described above, due to their fraudulent inducement of Gallaher to join Switchboard with the promises of the Engagement Letter, while never intending to consider the Engagement Letter to be binding and enforceable, and failing to disclose that the promise of commissions was false or fully discretionary, Switchboard and Dr. Anderson, acting in concert,

engaged in unfair and/or deceptive act or practices, in or affecting commerce, which has proximately caused injury to Gallaher pursuant to N.C. Gen. Stat. § 75-1.1. *et seq.*

223.    Switchboard and Dr. Anderson's acts, as described above, in obtaining Gallaher's signature on the Engagement Letter were unethical, unscrupulous, and substantially injurious to Plaintiff.

224.    The unfair or deceptive acts by Switchboard and Dr. Anderson were the cause of the injuries that Gallaher suffered.

225.    Gallaher relied on the unfair or deceptive acts of Switchboard and Dr. Anderson by deciding to leave a secure and lucrative position.

226.    Gallaher suffered damages as a result of Switchboard and Dr. Anderson's unfair and deceptive trade practices.

227.    After terminating Gallaher, Switchboard and Dr. Anderson failed and refused to pay Gallaher the commissions and other compensation promised in the Engagement Letter, although Gallaher met all conditions necessary for the commissions to accrue to him.

228.    As a direct result of Switchboard and Dr. Anderson's unfair and deceptive acts in violation of the North Carolina Unfair and Deceptive Trade Practices Act, Gallaher has suffered pecuniary harm in the form of lost wages and other economic damages as well as compensatory damages.

229.    In addition, Gallaher is entitled to recover treble damages pursuant to N.C. Gen. Stat. § 75-16 and his costs and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

230.    Gallaher is entitled to recover from Switchboard and Dr. Anderson, jointly and severally, an amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial,

including treble, compensatory, consequential, general, and special damages, attorneys' fees and costs plus prejudgment interest at the highest legal rate.

## SEVENTH CLAIM FOR RELIEF

### (Civil Conspiracy – As to All Defendants)

231.     Plaintiff incorporates by reference in this Claim for Relief the allegations contained in Paragraphs 1 through 230 of this Complaint as if fully set forth herein.

232.     Defendants acted together, in concert, to commit one or more of the acts complained of herein.

233.     Defendants had an agreement, express or implied, to undertake these acts to injure Gallaher.

234.     The acts complained of herein, including but not limited to Defendants' failure to pay Gallaher the commissions and other compensation owed to him, constitute overt acts in furtherance of the conspiracy.

235.     Defendants are jointly and severally liable for each other's bad acts done in furtherance of the conspiracy.

236.     Defendants' acts, described above, were deceptive, willful, wanton and malicious, and evinced an intentional or reckless indifference to and disregard for the rights of Gallaher. Accordingly, Gallaher is entitled to recover punitive damages against each Defendant in an amount to be proven at trial.

### PRAYER FOR RELIEF

Plaintiff Bradley Gallaher prays for the following relief:

1.     Pursuant to Count One (North Carolina Wage and Hour Act Violations Against All Defendants), that Gallaher have and recover from Defendants, jointly and severally, an amount in

36

excess of four-hundred thousand dollars ($400,000.00) to be proven at trial, for all unpaid wages and related benefits, interest at the highest legal rate from the due date, liquidated damages, attorneys' fees, and costs.

2. Pursuant to Count Two (Breach of Contract Against Switchboard and Dr. Anderson), that Gallaher have and recover from Switchboard and Dr. Anderson an amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial, including compensatory, consequential, general, and special damages, and the cost of this action, plus prejudgment interest from the date of breach at the highest legal rate;

3. Pursuant to Count Three (Unjust Enrichment Against All Defendants), that Gallaher have and recover from Defendants, jointly and severally, an amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial;

4. Pursuant to Count Four (Fraud in the Inducement Against Switchboard and Dr. Anderson), that Gallaher have and recover from Switchboard and Dr. Anderson, jointly and severally, an amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial, including compensatory, consequential, general, special, and punitive damages, the costs of this action plus prejudgment interest at the highest legal rate;

5. Pursuant to Count Five (Negligent Misrepresentation as an Alternative to Fraud in the Inducement Against Switchboard and Dr. Anderson), that Gallaher have and recover from Switchboard and Dr. Anderson, jointly and severally, an amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial, including compensatory, consequential, general, special, and punitive damages, the costs of this action plus prejudgment interest at the highest legal rate;

6.  Pursuant to Count Six (Unfair and Deceptive Trade Practices against Switchboard and Dr. Anderson), that Gallaher have and recover from Switchboard and Dr. Anderson, jointly and severally, an amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial, including treble, compensatory, consequential, general, and special damages, attorneys' fees and costs plus prejudgment interest at the highest legal rate;

7.  Pursuant to Count Seven (Civil Conspiracy Against All Defendants), that Gallaher have and recover from Defendants, jointly and severally, and amount in excess of seventy-five thousand dollars ($75,000.00) to be proven at trial, including treble, compensatory, consequential, general, and special damages, attorneys' fees and costs plus prejudgment interest at the highest legal rate;

8.  That Gallaher recover a percentage of the revenue generated by the RevAware product in an amount to be determined at trial;

9.  That Gallaher obtain ownership of all trade secrets and intellectual property that belong to Gallaher including the RevAware product;

9.  That Gallaher have and recover from Defendants, jointly and severally, all costs in this action, including attorneys' fees according to any statutory or contractual right;

10. That this action be tried by jury; and

11. That this Court grant such other and further relief to Gallaher as the Court deems just and proper.

Respectfully submitted this 5th day of February, 2026.

/s/ Philip A. Hinson
Philip A. Hinson, NC State Bar No. 42907
Lewis Brisbois Bisgaard & Smith LLP
521 East Morehead Street, Suite 250
Charlotte, NC 28202
Telephone: 704-557-9929
Email: Philip.Hinson@lewisbrisbois.com
**Attorneys for Plaintiff**